## Chambersburg and Bedford Turnpike Road.

*. Turnpike road companies—Condemnation of road—Act of June 2, 1887, P. L. 306—Exceptions for purpose of review.*

Exceptions which may be taken for the purpose of review in proceedings under the Act of June 2, 1887, P. L. 306, relating to the condemnation of turnpike roads, refer to the instructions given by the master to the viewers upon matters of law, and not to the admissibility of evidence, issuing writs of subpœna or compelling attendance of witnesses and production of papers. The jury of view may consider evidence independent of that offered before the master.

*Turnpike roads—Condemnation—Measure of damages.*

In proceedings to condemn a turnpike road the fair value of the roadbed, and the fair value of the franchises at the time of the condemnation are to be determined from the physical condition of the property, its substructure, superstructure, and approache to bridges together with the right or privilege of the company to collect tolls from travelers. The entire company rights of the turnpike company are taken, and it is the value of the property to the owner and not to the county taking it, that is to be determined.

Where a county institutes proceedings to condemn the portion of a turnpike road lying within the limits of the county, the character and productiveness of the whole road, and of the part affected by the proceedings are evidence to assist the jury in determining the value of the part condemned as compared with the whole road. It is not conclusive proof, but is for the consideration of the jury along with the other evidence in the case.

The returns made by a turnpike road company to the auditor general for the years preceding condemnation proceedings, are competent evidence to show the value placed by the company upon its own stock, since the valuation was made under oath by its own officers.

Where tollhouses are not within the right of way of a turnpike road, but are built by the company on land purchased by the company outside of the right of way for its own convenience, title to them is not divested in condemnation proceedings, but the jury may allow for any depreciation of value suffered by them in consequence of the condemnation of the road.

Argued Nov. 7, 1901. Appeal, No. 199, Oct. T., 1901, by the president and managers of the Chambersburg and Bedford Turnpike Road Company, from order of Q. S. Bedford Co., overruling exceptions in proceedings to condemn the Chambersburg and Bedford Turnpike Road in Bedford County. Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ. Affirmed.

Proceedings to condemn a portion of the Chambersburg and Bedford Turnpike Road in Bedford county.

The petition was referred to Frank Fletcher, Esq., as master, and a jury.   Voluminous testimony was taken, after the conclusion of which the petitioners presented to the master these points:

6. That the measure of damages in this case is not what it would cost to construct the road in question, but the jury should for the purpose of fixing the damages, take into consideration the earning capacity of the road, the value of the stock according to sales made and prices fixed in the returns to the auditor general's office, the length and location of the road to the Fulton county line, as related to the whole road, the expenses of keeping the same in repair, the ordinary risk to the bridges and structures along the line and the damage, if any, to the tollhouses, the receipts at the several gates for a number of years past and the net profits distributed on the whole, and such evidence as to cost of construction as may bear on the value of the property as related to its earning capacity.   *Answer :* This point is affirmed.

7. That the portion of the turnpike in controversy being operated by this company in connection with the remainder of the road from Bedford to Chambersburg, one method of determining the amount of damages sustained by the company is to estimate the value which the part condemned, in its earning capacity, bears to the value of the whole in its earning capacity. *Answer :* In estimating the damages sustained by the company the jury should take into consideration the earning capacity which the part condemned bears to the earning capacity of the whole road.   But this is not conclusive upon the jury. They should also take into consideration all the elements of damages, as stated in the general charge, in ascertaining the true damages for the condemnation of the portion of the road in Bedford county.

8. That as an element of damages the jury must take into consideration the present value which the company has placed upon its franchises and property by the returns in evidence filed with the auditor general under oath by the officers, and if they have no satisfactory means of arriving at the true measure of the damages for the part sought to be condemned,

they have a right to take that as their guide in determining that amount of damages which should be awarded to the company in this case. *Answer:* This point is affirmed with this qualification. The returns to the auditor general's office are evidence to be considered by you and is one of the elements of damages. If you have other satisfactory means of arriving at the true measure of damages, they should all be considered in connection with said returns, and you have no right to take said returns as your guide without taking into consideration all the elements of damages in the case.

9. That in taking the value of the franchises and property as returned to the auditor general's office under oath by the officers of this company, as a guide for fixing the damages to the company for the condemnation of the part of the turnpike in controversy, the jury may estimate the damages by ascertaining the value which said parts bear to the whole as measured by its earning capacity. *Answer:* We answer this point in this way: The jury may estimate the damages by ascertaining the value which the part condemned bears to the whole road, taking into consideration all the elements of damages. The point assumes that you will take the return to the auditor general's office as your guide. As before stated, these returns are an element of damage to be considered by you, but they must be taken in connection with all the other evidence in the case bearing upon the question of damages.

10. The capital stock represents the property and franchises of the corporation and the jury must consider, in estimating the damages in the case, the value of the capital stock and franchises according to the reports filed in evidence, and they have a right to take the company at its word for the value it has placed upon its own stock, and it is therefore important and competent testimony by which the jury may be guided, if they can find no other means of arriving at a satisfactory and true valuation, and in considering this evidence as a means of ascertaining the damages they may fix the damages for the part sought to be condemned, by ascertaining the proportionate value on the basis which said part bears to the whole road as valued by the said corporation. *Answer:* If the jury cannot find any other means of arriving at a true and satisfactory valuation than that mentioned in the point, then the rule therein stated might

govern. But all the evidence on the question of damages should be carefully examined to ascertain whether you can find any other means of arriving at a satisfactory and true valuation than by the reports. The reports are elements to be considered by you in ascertaining the damages. The jury as a means of ascertaining the damages may fix the damages for the part sought to be condemned by ascertaining the proportionate value on the basis which said part bears to the whole road."

The company presented these points:

10. That in determining the amount to be allowed the turnpike company in case of condemnation, the measure of damages is the value of the property taken at the time of taking, to the owners, not only the mere value of the road itself, the mere structure or physical turnpike, its bridges, tollhouses and tollgates, but the turnpike company's entire property rights in the same, with the value of its franchise in connection with those property rights, under and by virtue of which they are used and enjoyed. *Answer:* This point is affirmed, except as to the tollhouses. I am of the opinion that the title to these would still remain in the company, if you condemn the turnpike free from tolls and tollgates. The company should, however, be compensated in damages for any depreciation in their value should you condemn the turnpike.

12. That the measure of damages to the turnpike company for the taking of its road is the value of the property to the owners, and not to the county taking it; and this value is to be ascertained by the present cost of the physical structure, considered in connection with and in addition to the value of the franchises. *Answer:* The measure of damages to the turnpike company for the taking of its road is the value of the property to the owners and not to the county taking it. The value, however, is not to be ascertained by the present cost of the physical structure considered in connection with and in addition to the value of the franchises.

13. That in the value of the physical structure proposed to be taken under these proceedings, the jury must determine from the evidence in the case, what it would cost to place the roadbed, culverts, bridges and tollhouses in the condition in which they now are; and in arriving at this conclusion they must keep in mind the width of the roadbed, the manner in which

it has been built, the expense of cuts, fills and embankments, necessary to bring it to its present grade, and to put the road-bed in its present state of efficiency, the number, material and kind of work used in construction of the culverts, the style of architecture and material, and manner of building the bridges, and their present condition as to meeting the wants of the public in traveling over this highway. *Answer :* Refused. The cost is immaterial, except as to the bearing it may have on the question of value. It is a question of value. What is the road worth? Not what it cost. The jury should take into consideration the road as they found it, its roadbed, culverts and bridges, together with the evidence relative thereto, as these are elements to be considered by the jury in ascertaining the true value of the road. The jury should consider all the elements of damages in the case as I have submitted them to you.

The jury reported in favor of condemnation, and assessed damages at $5,087.50. Many exceptions were filed to the master's rulings on evidence, and instructions to the jury, including the points and answers above quoted.

*Errors assigned* were (1–30) in overruling exceptions based on rulings on evidence. (31–46) In overruling exceptions based on instructions given to viewers on matters of law. (47) Order of the court dismissing all of the exceptions.

*John H. Jordan* and *Frank E. Colvin*, for appellant.—The in-sructions as to the measure of damages were erroneous : Montgomery County v. Schuylkill Bridge Co., 110 Pa. 54 ; West Chester, etc., Plank Road Co. v. Chester County, 182 Pa. 48 ; Clarion Turnpike, etc., Co. v. Clarion County, 172 Pa. 243 ; Bustleton & Somerton Turnpike Road Co., 16 Pa. Superior Ct. 400 ; Mifflin Bridge Co. v. Juniata County, 144 Pa. 371 ; Kensington, etc., Turnpike Company, 97 Pa. 277.

*John M. Reynolds*, with him *Daniel S. Horn* and *Joseph F. Biddle*, for appellee.—The master's instructions on the law were proper : West Chester, etc., Plank Road Co. v. Chester County, 182 Pa. 49 ; In re Kensington, etc., Turnpike Road Company, 97 Pa. 277 ; Montgomery County v. Schuylkill

Bridge Co., 110 Pa. 54; Mifflin Co. v. Juniata County, 144 Pa. 375; Clarion Turnpike, etc., Co. v. Clarion County, 172 Pa. 251; Allentown, etc., Turnpike Co. v. Lehigh Valley Traction Co., 174 Pa. 283; Perkiomen, etc., Turnpike Road v. Berks County, 196 Pa. 24.

OPINION BY ORLADY, J., April 21, 1902:

The history of the Chambersburg and Bedford Turnpike Road Company began in an act of assembly of February 24, 1806, 4 Smith's Laws, p. 279, by which the governor of the commonwealth was authorized to incorporate a company for making an artificial road from the bank of the river Susquehanna opposite to the borough of Harrisburg to Pittsburg, which act was supplemented by one of March 9, 1814, 6 Smith's Laws, p. 120, by which the incorporation of five companies was provided for, and the section, of which the turnpike in controversy is a part, was styled the Chambersburg and Bedford turnpike. By the Act of March 26, 1821, 7 Smith's Laws, p. 393, entitled "An act for the improvement of the state," the governor was authorized to subscribe to this and other turnpike road companies, and by a schedule accompanying the act it appears that the construction of this section, fifty-five miles in length, represents original subsciptions of $113,850 by the state, and $167,500 by individuals. The road was completed under these proceedings and has been in continuous use ever since under its corporate name.

The present proceeding was begun on October 8, 1900, under authority of the Act of June 2, 1887, P. L. 306, by a petition, signed by 228 taxpayers of Bedford county, setting forth that the said turnpike, from the intersection of Juliana and Pitt streets near the Grand Central Hotel in the borough of Bedford eastward to the Fulton county line, . . . . a distance of nineteen miles, was in bad condition, and that its bridges were of a dangerous character, and that for other reasons, it was for the best interests of the people of Bedford county that the portion of the turnpike described should become a public road, free from tolls and tollgates, and the signers thereof prayed the court to appoint a jury of view, etc., to view and condemn said turnpike road, between the points named, and to assess the damages to which the owner or owners of said road might be entitled. The proceeding being in accordance with the provisions of the act,

the court appointed a jury of view of five reputable citizens, a master and a stenographer, who acted and made a report to the court, which, after argument on exceptions filed thereto, was confirmed on July 17, 1901, and from that decree this appeal was taken.

The testimony taken is printed on 320 pages of appellant's paper-book, and the first thirty assignments of error are filed to the action of the master in admitting evidence offered by the petitioners. By the 2d section of the act, the master is to be a person learned in the law, "who shall preside at all the meetings of the viewers and to have power to determine the admissibility of evidence, to issue writs of subpoena, to compel the attendance of witnesses and the production of papers, and instruct the viewers upon matters of law, to which exceptions may be taken for the purpose of review." The exception to be taken as above noted does not refer to the admissibility of evidence adduced before the jury. The tribunal created by this statute and called a jury of view is a different one from a trial jury in the courts of law. The juror's oath prescribed by the act of 1887 is "to perform his duties with fidelity, impartiality, and according to the best of his judgment" which is materially different from that directed by the act of April 13, 1834, regulating trial by jury in the civil and criminal courts. The jury under the act of 1887 is not confined to the evidence adduced by witnesses. By the proviso to the 3d section, "Such jury of view may report in favor of the petitioners, if such jury of view decree it for the best interests of the people of their county, without hearing any witnesses, if no request is made by any party to have witnesses examined."

In the light of the authority given to the master under this statute, it is but reasonable to hold that it was intended to limit the exception to be taken for the purpose of review to the last duty imposed upon him, to wit: the instruction given by him to the viewers upon matters of law, and not to the admissibility of evidence, issuing of writs of subpoena or compelling attendance of witnesses and production of papers. This view is strengthened by the 8th section of the act providing for an appeal to the court of common pleas of the proper county from the assessment of damages, and for the framing of an issue, "which shall be tried by a jury, according to the

course of the common law as regulated by existing statutes and the record thereof shall be remitted to the proper court of quarter sessions for further action upon the whole case," which judgment so enterered is reviewable by the appellate courts upon writ of error as in other cases. To sustain the contention of appellants in this phase of the case would give two trials on questions of fact and result in expensive and vexatious litigation. We held in Factoryville Turnpike, 19 Pa. Superior Ct. 613, that "this is a certiorari under the provisions of the 6th section of the act of 1887, and our concern here is simply with the regularity of the proceedings." For this reason the first thirty assignments of error are overruled. The assignments from thirty-one to forty-six, inclusive, are founded upon exceptions taken to the instructions given to the viewers upon matters of law.

The measure of damages in a turnpike condemnation proceeding has been considered by this court in Bustleton & Somerton Turnpike Co., 16 Pa. Superior Ct. 400, in which case the recent decisions of the Supreme Court are reviewed and followed.

In that case we held that all that is taken from the company should be paid for, no more and no less, and all that is taken, not may, but must be, considered by the jury of viewers in determining the reasonable damages for which the county should pay in taking the property of the turnpike company for public use. It is clearly decided that the fair value of roadbed and the fair value of the franchises at the time of the condemnation are to be determined from the physical condition of the property, its substructure, superstructure, and approaches to bridges, together with the right or privilege of the company to collect tolls from travelers. The entire company rights of the turnpike company are taken, and it is the value of the property to the owner and not to the county taking it, that is to be determined: Montgomery County v. Schuylkill Bridge Co., 110 Pa. 54; Clarion Turnpike & Bridge Co. v. Clarion County, 172 Pa. 243; West Chester & Wilmington Plank Road Co. v. Chester County, 182 Pa. 40.

The physical, tangible property and the right to collect tolls from the public on the part of the turnpike company exclusive of this section of nineteen miles is not affected by this proceed-

ing except as its value is depreciated by this condemnation. The part in Fulton county must necessarily be considered as part of a public thoroughfare and its relation to the part condemned as an element of profit or loss. The character of the travel as well as the structural value of the property, use of new roads, change in public and private enterprises affecting travel on this turnpike were properly before the jury for consideration. The affairs of the corporation were managed with reference to the entire length of the road. The value of its stock, its annual gross and net earnings, expenses, and the structural condition of the road were shown by evidence adduced by the company and the petitioners. The master rightly held that the original cost of construction is not material except as to the bearing it may have on the question of value. "It is a question of value. What is the road worth, not what did it cost?" The jury should take into consideration the road as they found it, its roadbed, culverts and bridges, together with the evidence relative thereto, as these are elements to be considered by the jury in ascertaining the true value of the road. This instruction followed the rule laid down in Mifflin Bridge Co. v. Juniata County, 144 Pa. 371, and West Chester, etc., Plank Road Co. v. Chester County, 182 Pa. 40, 48. The effort on the one side was to make the property a very valuable one, on the other to show that it was of but little value. This jury decided that it was for the best interests of the people of Bedford county that the designated part should be made free from tolls and tollgates, and assessed the damages sustained by the company at $5,087.50. The character and productiveness of the whole road and of the part affected by these proceedings were shown in order to assist the jury in determining the value of the part condemned as compared with the whole road. It was not conclusive proof, but was for the consideration of the jury along with the other evidence in the case, and as submitted by the master was not in conflict with Perkiomen, etc., Turnpike Road v. Berks County, 196 Pa. 21.

The returns made by the turnpike company to the auditor general for ten years preceding this condemnation were competent evidence to show the value placed by the company upon its own stock—a valuation made under oath by its own officers : Mifflin Bridge Company v. Juniata County, 144 Pa. 375. The

property and the franchises are represented by its stock and the market value of the stock may be said to represent the market value of the property taken, as nearly as it can be ascertained: Montgomery County v. Schuylkill Bridge Co., 110 Pa. 54 ; Allentown, etc., Turnpike Co. v. Lehigh Valley Traction Co., 174 Pa. 275. It was clearly shown by the evidence that the tollhouses were not within the right of way secured to it by the state, and this condemnation does not affect the title of the company to these properties. They are not only outside of the strip of ground, fifty feet wide, on which the road was built, but title to them was acquired by the company for its convenience by independent purchase. The depreciation in value of these properties by reason of the condemnation was properly submitted to the jury and passed upon by the learned trial judge below in overruling the exceptions filed to the report of the jury of view. "But these properties were not procured by the aid of the state as incident to the franchises conferred on the company. They were obtained by means altogether independent of any governmental authority, and the title to them, as related to the turnpike, is no more subject in this case, to the sovereign power of the commonwealth than that of any farm lying along its way. In making these private purchases the company was not limited as to the extent of its holdings. If it could hold one and a half acres in a body, we see no legal reason why it might not hold ten or twenty. In either case it must all lie outside of the roadway and the corporate privileges bestowed by the commonwealth. As already shown, the tollhouses could have been built within the fifty feet dedicated to the public use, but on the score of mere convenience and comfort, and not from necessity, lots of larger dimensions were preferred outside. The makers of the act of 1887 certainly never contemplated that it should affect anything but the mere highway, and it only in order that its use might be transferred from the corporation to the public. Every permanent structure standing upon the road would, of course, pass with it. This proceeding is a mere withdrawal of the privileges derived from the state and operates only on the company's franchises and the property acquired thereunder through the state's authority. But if we would assume, as the company does, that the lots in question might be taken under the act of

1887, what would then become of them.? The legislature cannot authorize the taking of private property, or public property for that matter, for any other than a public use: Waddell's Appeal, 84 Pa. 90. What public use would be made of these lots and dwellings? And where would the title rest? The county pays the damages under the act of assembly. Could it take title to and hold them? The turnpike itself passes, by the 11th section of the statute, to the townships and boroughs in which it lies: Pittsburgh, etc., R. R. Co. v. Commonwealth, 104 Pa. 583–587."

Upon consideration of the whole record the assignments of error are overruled and the decree of the court in confirming the report of the jury of view is affirmed.